## ADOPTION OF NATASHA & others.[1]

No. 01-P-613.

Essex. October 4, 2001. - December 21, 2001.

Present: BROWN, CYPHER, & KAFKER, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Custody, Dispensing with parent's consent to adoption. *Minor,* Adoption, Custody. *Department of Social Services. Conflict of Interest. Practice, Civil,* Adoption, Findings by judge, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

Action of the Department of Social Services (DSS) in violating one of its own regulations by placing a child with a DSS employee from the same DSS service area, and in failing to discontinue its investigation and presentation of a petition against the mother after the DSS employee announced her intention to accept placement, required neither the allowance of a motion by the child's mother to dismiss the petition of DSS to dispense with her consent to adoption, nor a remand for further proceedings, given the evidence of the mother's unfitness, her failure to make a timely request for a remand, her opportunity to cross-examine DSS witnesses to show bias, and the inevitable need to review DSS documents and to consider DSS testimony at any retrial. [448-451]

In a proceeding to dispense with a mother's consent to the adoption of her child, the judge's subsidiary findings were not clearly erroneous and his determination of parental unfitness was supported by clear and convincing evidence that was either uncontested or not dependent upon the Department of Social Services (DSS), despite the fact that the preadoptive mother for the child was a DSS employee for the same service area. [451-453]

In a proceeding to dispense with a mother's consent to the adoption of her child, the mother's counsel's failure to insist at trial that the Department of Social Services be disqualified did not constitute ineffective assistance where, given the clear and convincing evidence of the mother's unfitness, the result, terminating parental rights, would have been the same. [453]

PETITION filed in the Lawrence Division of the District Court Department on April 15, 1994.

---

[1]Adam, born on January 14, 1992, and Michael, born on February 13, 1993, are brothers, and Natasha, born on July 21, 1994, is their half-sister. All the children's names in this opinion are pseudonyms.

The case was heard by *Paul C. Menton*, J.

*Claudia Leis Bolgen* for the mother.

*John E. Bowman, Jr.*, Assistant Attorney General, for Department of Social Services.

*Patrick J. Johnston* for the children.

KAFKER, J. The mother appeals from a December 23, 1999, District Court order committing her sons, Adam and Michael, and her daughter, Natasha, to the permanent custody of the Department of Social Services (DSS) and dispensing with the need for her consent to their adoption.[2] The mother claims that her trial was fatally flawed due to the participation of DSS, when the proposed adoptive mother of Natasha was, at all relevant times, a supervisor at the DSS office from which the biological family received services. She seeks disqualification of DSS, a remand, and the appointment of a private agency to investigate and, if necessary, present a petition. Although we affirm the District Court judge's decision, as his findings are supported by the record and taken together prove clearly and convincingly that the mother is currently unfit, we are troubled by DSS's disregard of its own procedures as well as protocols established by the case law.

1. *Proceedings in District Court.* Trial on the DSS petition to terminate parental rights began on April 12, 1999, and continued over six trial days, concluding on May 11, 1999. Sixteen witnesses testified, including two former and three current DSS employees who were involved with the mother and the children at various points from 1994 to 1999. In addition to numerous DSS service plans and foster care reviews, the judge admitted in evidence five separate reports of an independent court investigator and three reports of two different guardians ad litem, none of whom were DSS employees.

Before trial, the mother made a motion to dismiss, on which the judge delayed ruling, based on DSS's failure to comply with the regulation prohibiting the placement of children with

---

[2]Adam and Michael's father also filed a notice of appeal, but did not docket the appeal in a timely fashion. His motion to docket the appeal late was denied on June 5, 2001. The father of Natasha did not participate in the trial. The children filed a brief as appellees, arguing that their best interests require termination of the mother's rights.

DSS employees in offices serving them.[3] The regulation provides as follows: "A child in the custody of the Department and whose case is managed by the Department may be placed in a Department employee's home (approved and supervised by a private agency) unless the child is from the employee's own area (if the employee works in an area office)." 110 Code Mass. Regs. § 7.106(3) (1998). On the third day of trial, the judge denied the mother's motion to dismiss for failure to comply with the regulation, ruling that DSS's was but a "minor technical violation."[4] The mother did not appeal the denial of the motion to dismiss at that time.[5]

2. *Background and findings.* The facts recited below were found by the judge unless otherwise indicated. After the birth of her first child Adam, the mother became involved with the Good Start Program. According to her contact in the program, Esther Pardo of the Massachusetts Society for the Prevention of Cruelty to Children (MSPCC), the mother moved six times in a year and one-half,[6] roughly treated Adam, and allowed drinking and drug use in the family's apartment.

The mother first became known to DSS on June 23, 1993,

---

[3]A second ground for dismissal, DSS's failure to produce records, was alleged and likewise denied. That issue is not raised on appeal.

[4]The judge ruled from the bench as follows: "I'm going to rule that the Department was in technical conflict. However, I don't think the technical conflict in any way reaches to the degree that would require a dismissal of this matter, and I am mulling in my mind whether I should order any sanctions or not and I will decide that later; but as far as I'm concerned, the Department was in technical violation of its own regulations which is a technical conflict of interest. I think it does not rise anywhere near to the extent which would require a dismissal and I'm not sure would require any sanctions whatsoever, other than a notification to the Department that they were in technical violation."

In an endorsement on the motion itself, the judge wrote: "D.S.S. found to be in violation of 110 C.M.R. 7.204 (3) [the section that in October 1998 was replaced by an in all relevant respects identical section, 110 C.M.R. 7.106], *however violation is not such that a Dismissal should be order[ed]. Found to be a minor technical violation.*"

[5]"A party need not claim an appeal from an interlocutory order to preserve his right to have such order reviewed upon appeal from the final judgment." Mass.R.A.P. 3(a), as amended, 378 Mass 927 (1979).

[6]The judge's findings reference at least fourteen moves by the mother. He found her "constant moving" affected her ability to receive services and reflected her personal instability.

when a G. L. c. 119, § 51A, report was filed alleging her neglect and emotional maltreatment of Adam and Michael. A follow-up investigation concluded that the mother was unable to provide adequate care for the children and that she was verbally abusive to them. The children were reported to have missed numerous pediatric appointments from March, 1992, to February, 1994, including appointments for immunizations. In September, 1993, the father of Adam and Michael, who had a long criminal history, returned to live with the mother and the children.

In April, 1994, DSS filed a care and protection petition alleging that the children were at risk of emotional, physical, and medical neglect. On April 15, 1994, after a seventy-two hour hearing, DSS was granted legal custody of Adam and Michael while physical custody remained with the mother. After Natasha was born on July 21, 1994,[7] the mother neglected to take advantage of home-based counseling and services made available to her through MSPCC and Catholic Charities and did not send her children to the day care program in which they were enrolled.[8]

In November, 1994, the mother moved from her apartment with the three children without notifying DSS of her new address. DSS immediately petitioned for and was granted physical as well as legal custody of the three children. All three were placed in foster care at that time, Adam and Michael with the Smith family,[9] and Natasha with the Jones family. In December, the mother reported to DSS that the father of Adam and Michael had been incarcerated for armed robbery while masked.

DSS social workers counseled the mother over the next year and one-half, with the goal of reunifying her with her children. Toward this end, they required that she attend parenting classes and individual therapy, as well as obtain adequate housing. She worked with at least three private social services agencies, but her attendance at scheduled appointments was erratic, and she

[7]The mother's fourth child, Andrea, was added to the petition shortly after her birth in July, 1995, but was not a party to these proceedings.

[8]The judge found that the mother failed continuously and repeatedly to follow through on services which were offered and available for her and her children throughout the entire time period at issue.

[9]The respective foster and preadoptive families' names are pseudonyms.

was terminated from two of the programs. DSS continued to supervise visits between the mother and her children until February, 1996, when unsupervised visits were allowed, as DSS determined she was in sufficient compliance with her service plans.

The mother was arrested for assault and battery with a dangerous weapon in April, 1996, and briefly held on bail, when the police found a woman who had argued with the mother bleeding from her forearm and left breast area. The mother was found in possession of a "box knife." At that time, it was also ascertained that she was in violation of her probation. She pleaded guilty to the probation violation and received a sentence for assault and battery with a dangerous weapon for which she was incarcerated from October 14, 1996, to August 28, 1997.

DSS changed its goal for the children from reunification to adoption in October, 1996, two weeks after the mother was incarcerated at M.C.I., Framingham. On March 5, 1997, while the mother was still in prison, DSS amended the care and protection petition to include a request that the court terminate parental rights.[10]

Although the judge did not make specific findings regarding the involvement of Ms. Doe, the DSS employee who is the preadoptive mother, with the biological mother and her children, it is uncontested that Ms. Doe first saw Natasha in the course of Ms. Doe's work in the DSS office. See *Bruno* v. *Bruno*, 384 Mass. 31, 35 (1981); *Adoption of Lorna*, 46 Mass. App. Ct. 134, 135 (1999). The Doe family came forward as potential adoptive parents in November of 1997.

The judge also made the following findings: The biological mother was released from prison at the end of August, 1997, and moved into a two bedroom apartment with her then boyfriend and his brother. In mid-February, 1998, the mother began attending therapy sessions as required by her DSS service plan. As reported by a clinician from the Lawrence Psychological Center, the mother failed to attend five of thirteen scheduled therapy sessions and terminated the sessions altogether when

---

[10]The fourth child, Andrea, has, since May 1, 1996, been in custody of the mother's sister, whose unopposed petition for guardianship of the girl was granted on March 8, 1999.

her fifth child, Karl, was born in August, 1998. In May, 1998, her boyfriend, with whom the mother was still living, was shot while in a car with some friends. On July 15, 1998, the mother's sister, who had custody of Andrea, sought and was granted a restraining order against the mother and her boyfriend, after she saw him break her car windows. On August 2, 1998, the evening before the birth of Karl, there was a drive-by shooting into the apartment the mother occupied with her boyfriend that left five bullet holes in the door and walls of the living room. She stated to a DSS social worker that she did not know why someone would shoot into her apartment. The worker, however, testified that the boyfriend had a long criminal history and that by the time of trial in April, 1999, was serving time in Federal prison on drug-related charges. A DSS social worker also testified that during 1998 the mother showed a limited ability to engage her children at visits and that Natasha showed no interest in her mother.[11]

Although the judge did not so find, the record reveals the following uncontroverted facts: DSS transferred Natasha's adoption to Catholic Charities in February, 1998. At that time, a home study of the Doe family by a New Hampshire social services agency, which had been requested by the Lawrence DSS office, was pending. The Doe family, consisting of Ms. Doe, her husband, and their biological daughter, who is ten months older than Natasha, lived in New Hampshire. When the study approving the Doe family as an adoptive placement for Natasha was received by Catholic Charities in March, 1998, Karen Santella, the Catholic Charities adoption worker, began to oversee the transition of Natasha from the home of the Jones family, where she had lived since her removal from the mother in November, 1994, to the home of the Doe family. The Jones family was not interested in adopting Natasha. Natasha's transition was completed in June, 1998. Adam and Michael moved to their preadoptive home with the Grey family in March, 1999, as

---

[11]In her January, 1999, report, the independent court investigator opined that "[the mother] does not currently present as having adequate/appropriate lifestyle and parenting capability to take on the challenge of caring for her four children named in this Petition." She cited the mother's lack of financial resources, her recent eviction, her troubling relationship with a boyfriend who was involved in crime, and her recent incarceration.

the Smith family, with whom the boys had been living since their removal from the mother's home in November, 1994, was unable to adopt them. Reports by DSS social workers dated March 3, 1999, proposed the Grey family as adoptive parents for both of the boys.

The judge found that the proposed adoptive families for Natasha and for Adam and Michael were loving and supportive and that the proposed plans under which the families would adopt them were in their best interests.[12] He found that the children had been in custody of DSS since November, 1994, when Natasha was four months old, and that the mother was "probably caring for" Karl, who remained in her custody at the time of trial.

The judge relied on an evaluation of Natasha and the mother performed in February and March, 1999, by Kenneth Herman, the director of the Children and the Law Program at Massachusetts General Hospital. Herman found no evidence of any psychological bond between the mother and Natasha and stated that Natasha did not see her biological mother as a parent figure. Herman testified that, if Natasha were moved from the preadoptive family home, she would be significantly and irrevocably harmed as she is more vulnerable than other children because the preadoptive family was her third placement in fewer than five years. Herman described the mother as "cavalier, showing no urgency in her desire to see the child."[13]

The judge concluded that the evidence demonstrated clearly and convincingly that the mother was currently unfit to parent

[12]The mother specifically challenges the judge's conclusion that Adam and Michael "have formed a strong positive bond with the substitute care givers which has existed for a significant portion of their lives." She interprets the statement to be directed only at the preadoptive parents and, therefore, to be clearly erroneous because they had been placed with the preadoptive parents for less than two months prior to trial. We interpret the statement as being directed at both the Smith and Grey families. The judge's specific findings in regard to the Grey family were that they were "able to meet the physical, emotional and cultural needs of these children and the interaction between them and the children seems to be loving and supportive."

[13]He noted that the mother arrived for her appointment with him and Natasha nearly an hour late, carrying a cup of Dunkin' Donuts coffee for herself, and nothing for Natasha, whom she had not seen in nearly a month.

Natasha, Adam, and Michael and that adoption by their pre-adoptive families was in their best interests.

3. *Discussion.* a. *Conflict of interest.* The court in *Petition of Dept. Social Servs. to Dispense with Consent to Adoption,* 384 Mass. 707, 710-713 (1981), highlighted the concerns raised when DSS employees seek to become preadoptive parents in cases in which the agency is seeking to dispense with the biological parents' consent to adoption. In that case, a child born in 1974 was taken from her mother by DSS and, in 1977, was placed in a foster home with a DSS employee. In 1978, a petition to terminate parental rights under G. L. c. 210, § 3(c), was filed, as was a plan for adoption by the DSS employee. The biological mother sought, as did the mother here, to dismiss the petition, arguing that the DSS's placement of the child with one of its own employees was illegal and that "all subsequent proceedings [were] tainted" by a conflict of interest. *Id.* at 710. The Probate Court judge reserved and reported the issue.

On direct appellate review, the Supreme Judicial Court, in explaining the basis for its decision, stated that "the department is extraordinarily influential in its capacity to interfere with family relationships between parents and children." *Id.* at 712. As a result the "department must be free from private interests and private influences" and avoid even the "appearance" of a conflict of interest. *Ibid.* The court concluded that "it would be prudent to disqualify the department from presenting the Commonwealth's case in these proceedings." The court further held that "the probate judge should appoint a licensed child care agency to investigate and present this petition." *Id.* at 713.

The court did not, however, dismiss the termination proceedings, as it rejected any remedy that did not take into account the children's best interests. Nor did it apply an "exclusionary rule" to DSS evidence. *Id.* at 711. See *Custody of a Minor (No. 2),* 13 Mass. App. Ct. 290, 299 (1982). Moreover, in addressing the mother's claim that DSS was biased, the court recognized that the "opportunity to cross-examine the witnesses from the department who testify, if any, is sufficient to show possible bias and conflicts of interest." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, supra* at 716

n.17.[14] Most importantly, the court stated its "first and paramount duty is to consult the welfare of the child." *Id.* at 717 (citations omitted).

We recognize that, in the case before us, DSS has violated one of its own regulations by placing a child with a DSS employee from the same service area.[15] Here DSS employees servicing, reviewing, and investigating the biological mother were colleagues of the preadoptive mother, a situation not present in the earlier case. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707. Those employees' relationship with their fellow employee put into question the objectivity of their work and testimony.

In addition to violating its own rule, DSS did not scrupulously follow the approach adopted by the Supreme Judicial Court. See *id.* at 711-713. DSS did not discontinue its investigation and presentation of the petition against the mother after Ms. Doe announced her intentions, or even discontinue its investigation and presentation of the petition after the motion to dismiss was filed. Instead, while Natasha's placement with the Doe family was in fact reviewed, approved, and supervised by outside agencies, the mother and her children continued to be served by the Lawrence DSS office in which Ms. Doe worked. DSS social workers oversaw visits between the mother and all three of her children, entered into service plans with the mother, and continued to present the petition in court.

When the motion to dismiss was argued below, however, the mother did not request that DSS discontinue its investigation

---

[14]Although prior to trial, and therefore prior to fact-finding, the court in that case in a footnote noted allegations that the mother had been tried in the state of Florida on the charge of murdering her father, found not guilty by reason of insanity, and released from a state hospital. *Id.* at 713 n.12.

[15]The language in the current regulation is more forceful than that in the regulation in effect in 1981. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, *supra* at 712. The earlier regulation read as follows: "No child in a worker's and/or supervisor's caseload shall be placed in the worker's and/or supervisor's home. Whenever possible a child who is being placed with a Department employee should be from a different CSA [Community Service Area] than the one in which the employee works." 106 Code Mass. Regs. § 288.031 (1978).

and presentation of the petition. In response to questioning by the trial judge regarding the appropriate remedy to address DSS's conduct, the mother only sought dismissal. No party suggested disqualification was appropriate. For the first time on appeal, the mother contends that DSS should be disqualified, the judgment should be vacated, and the matter remanded to the trial court for the appointment of a licensed child care agency to investigate the case and present any new trial.

In considering what remedy, if any, is required to address DSS's conduct, our lodestar is, of course, the best interests of the children. Dismissal is no longer being requested, nor do we consider it appropriate in light of the evidence of parental unfitness. "Although the department undoubtedly made mistakes in the conduct of this case, we are unconvinced that the department's conduct has been 'so arbitrary and irrational as to warrant a dismissal.' " *Petition of Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 586 (1981) (citation omitted). Though the Supreme Judicial Court counsels that disqualification of DSS and appointment of a licensed care agency to investigate and present a petition is a "prudent" remedial measure, *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. at 712, we are not convinced it is compelled regardless of the facts concerning the mother's unfitness, regardless of whether such relief had been timely requested, and regardless of the needs of the children.

The Supreme Judicial Court has adopted a prospective approach, albeit at an earlier stage in the proceedings; disqualification in the case before us now would require a remand, an entirely new trial, and continued, perhaps prolonged uncertainty for the three children. Given the evidence of the mother's unfitness, as set forth above and as discussed below, the failure to make a timely request for a remand, the mother's opportunity to cross-examine DSS witnesses to show bias, and the inevitable

need to review DSS documents and consider DSS testimony at any retrial, we conclude a remand is not warranted.[16]

b. *Parental unfitness.* A trial judge's "subsidiary findings must be proved by a fair preponderance of the evidence, and will not be disturbed unless clearly erroneous." *Adoption of Quentin,* 424 Mass. 882, 886 (1997) (citation omitted). *Adoption of Hugo,* 428 Mass. 219, 224 (1998). The judge's findings, taken together, must "prove clearly and convincingly that the parents are currently unfit to provide for the welfare and best interests of their children." *Adoption of Quentin, supra.*

We conclude that the judge's subsidiary findings are not clearly erroneous and that his determination of parental unfitness is supported by clear and convincing evidence. See *ibid.*; *Adoption of Sherry,* 435 Mass. 331, 339 (2001). In reviewing the judge's findings and determinations, we begin by recognizing that, with very few exceptions, the mother does not specifically challenge the facts found against her[17]; she relies instead on her general argument that DSS conduct taints the entire process, including fact findings by the judge. Nevertheless, the key findings of emotional maltreatment, neglect, constant movement as well as incarceration, repeated failures to make use of services, and companions with long criminal histories were supported by witnesses and documentation from multiple sources, including those who were not DSS employees. See generally *Adoption of Sean,* 36 Mass. App. Ct. 261, 264 (1994). The DSS employees were also cross-examined for bias.

In the time period after Ms. Doe announced her interest in adopting Natasha, our concerns about conflict of interest are heightened, and we require an "extra measure of evidentiary protection." *Custody of a Minor (No: 2),* 13 Mass. App. Ct. at

---

[16]DSS should nonetheless act immediately to ensure that, in the future, it fully abides by its own procedures and the protocols recommended by the case law. In other circumstances, DSS shortcomings could require a remand.

[17]The mother does specifically and correctly challenge the judge's conclusion that "the parents have demonstrated a history of substance abuse." At least in regard to the mother, there is no factual support for this statement. Nevertheless, it is not a key finding and would not have "impact[ed] on the ultimate findings of fitness and the best interests of the child." *Adoption of Astrid,* 45 Mass. App. Ct. 538, 548 (1998). The other specific factual objection she raised is addressed in note 13, *supra.*

300 (citation omitted). Nevertheless, the critical testimony for this time period is either uncontested or provided by those without DSS affiliation. Testimony regarding her assault and incarceration was provided by the police. The shooting of her boyfriend and his imprisonment for drug trafficking were uncontested, as was the firing of five bullets into the apartment. The mother's own sister described the mother's boyfriend breaking the sister's car window and the sister's obtaining a restraining order against both the mother and her boyfriend.

There is ample independent testimony, including for example, a clinician from the Lawrence Psychological Center, regarding the mother's pattern of failing to utilize required services during this time period. To support his finding of a lack of a parental bond between the mother and Natasha and the significant and irrevocable harm to Natasha if she were removed from the Doe family, the judge relied on independent expert Kenneth Herman. Moreover, the independent court investigator found in January, 1999, that the mother did not "currently present as having adequate/appropriate lifestyle and parenting capability to take on the challenge of caring for her four children."[18] In sum, there is clear and convincing evidence of her unfitness that is either uncontested or not dependent upon DSS.[19] Furthermore, the judge was fully aware of the potential for bias and was therefore able to give the testimony from DSS its appropriate weight. In these circumstances, the judge's decision to dispense with the mother's consent to adoption was justified despite the fact that

---

[18]The mother contends, however, that the fact that she cares for her baby Karl shows that she is a fit parent. "A parent may be fit to raise one child and unfit to raise another." *Adoption of Kimberly*, 414 Mass. 526, 530 n.8 (1993). Because Adam, Michael, and Natasha have not lived with the mother since 1994, the difficulties they would face if reunited with her are much more daunting than those faced by Karl, her youngest son who has lived with her since birth. See *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262-263 (1996). With Natasha, these issues are even more pronounced, as evidenced by the independent expert testimony of Kenneth Herman.

[19]At one point the judge misstated the standard when he wrote: "I do not find by clear and convincing evidence that she is fit to handle the other three children." Considering the judge's order in its entirety, he states the standard correctly several times, we conclude that the judge applies the correct standard.

the preadoptive mother for Natasha was a DSS employee from the same service area.[20]

c. *Ineffective assistance of counsel.* The mother argues that her counsel's failure to insist at trial that DSS be disqualified constitutes ineffective assistance. She argues that "what happened here was that no party, including the trial judge, had knowledge of the controlling law." Given (1) the clear and convincing evidence of unfitness that is either uncontested or not dependent on DSS, (2) the review of Ms. Doe's suitability as a parent by outside agencies, and (3) the needs of the children including that Natasha would suffer significant and irrevocable harm if she were removed from the Doe family, we conclude that the result, terminating parental rights, would have been the same notwithstanding trial counsel's failure to argue for disqualification. Furthermore, the mother's trial counsel did put the issue of DSS bias directly before the judge, as she argued for the ultimate remedy of dismissal. In these circumstances, we conclude that trial counsel was not ineffective. See *Adoption of Holly*, 432 Mass. 680, 690 (2000).

*Decrees affirmed.*

---

[20]The problem of a social services worker or her immediate family adopting a child who receives services from her agency has been addressed outside the Commonwealth as well. In California, Maine, and Oregon, courts have upheld adoptions by caseworkers and their families in the face of parental allegations that conflicts of interest resulted in less than diligent efforts by the agencies involved to reunite the families. See *San Diego County Dept. of Social Servs.* v. *Gavin O.*, 8 Cal. 4th 398, 421-422 (1994) ("condemn[ing] the unseemly conduct of the Department," but affirming the decision terminating parent's rights); *In re Denise M.*, 670 A.2d 390, 393-394 (Me. 1996); *State ex rel Juvenile Dept. of Gilliam County* v. *Davis*, 49 Or. App. 485, 487 (1980).