NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-78

ADOPTION OF PIERCE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree entered by a judge of the Juvenile Court terminating her parental rights, claiming that there was insufficient evidence to support certain findings. The father does not appeal from the termination of his parental rights, but joins with the mother in challenging the judge's approval of the adoption plan proposed by the Department of Children and Families (department) on the grounds that the adoption plan was not in the child's best interests.  We affirm.

Discussion.  "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011).  "A finding of

_____

[1] A pseudonym.

unfitness must be supported by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence.  See Adoption of Elena, 446 Mass. 24, 30-31 (2006).  'We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion.'  Adoption of Ilona, supra."  Adoption of Patty, 489 Mass. 630, 637 (2022).

1.  Findings.  The mother challenges several of the judge's findings regarding her fitness.  We set forth a brief summary of the judge's overall findings for context.

Thirty-four years of age at the time of trial in 2021, the mother has a long history of substance use dating to when she was eighteen years old.  She had heroin and Suboxone in her system when she gave birth to her oldest child in 2011.  The mother's parental rights to that child were terminated, and that child was adopted by the maternal grandmother.

Pierce was born in 2014, also having been exposed to substances at the time of birth.  For a variety of reasons, including the mother's positive test for opiates and amphetamines shortly before his birth, Pierce was placed in foster care with the kinship placement that ultimately became the preadoptive placement (foster parents or preadoptive

2

parents).  When the mother and father began to participate in services, the department considered reunification and began overnight visits.  However, in November of 2017 the mother tested positive for substances while in labor with a third child, and visits with Pierce were suspended.  In 2018, overnight visits resumed between the parents and Pierce, and ultimately Pierce was returned to live with the mother and father in New Hampshire in April of 2018.

The father told the mother to leave in November of 2018 after she told him that Pierce might not be his child, and drove them to the maternal grandmother's house in Massachusetts.  The mother and Pierce returned to live with the father in New Hampshire in February of 2019.  However, in March of 2019 the mother was arrested following a domestic dispute with the father, who obtained a restraining order against her.  After that incident, the mother lived in a shelter in New Hampshire and Pierce remained with the father.  Some days later, the father -- now the sole parent caretaker of Pierce and his two younger brothers -- drove Pierce to the maternal grandparent's home in Massachusetts and left him there.  In April of 2019, the mother returned to Massachusetts to live with the maternal grandmother and Pierce.  After several weeks, the mother left with Pierce.  She and Pierce stayed with various family members and friends through August of 2019.

Ultimately the department filed a second care and protection petition. In July of 2019, while she was Pierce's sole caretaker, the mother tested positive for morphine, and unprescribed oxycodone and oxymorphone. At the time the mother was not participating in substance abuse treatment, and later testified that she did not go to treatment because she did not think she needed it. The trial judge found the mother's belief to be indicative of the mother's lack of understanding of her illness or its impact on her ability to care for Pierce. During this period, the department could not locate the mother or Pierce for an extended period. The department was granted temporary custody on August 6, 2019, and Pierce was returned to the kinship placement.[2]

Between September of 2019 and February of 2020 the department social worker was unable to visit the mother, either because the mother did not answer her door or because she did not go to an agreed upon location. The mother had no contact with the department between December of 2019 and March of 2020, when the mother called the department social worker. The social worker's attempts thereafter to contact the mother were unsuccessful.[3]

---

[2] The department asked the father to take Pierce, but he declined.

[3] The judge found that the social worker made sustained efforts to locate and reach the mother.

4

In June of 2020, the mother ingested heroin, along with Prozac, gabapentin, and clonidine, and was hospitalized. She entered and successfully completed the High Point program at the Shattuck Hospital and then entered a residential treatment program. She left that program before completion and the judge found that she "has not demonstrated an ability to maintain long-term engagement in substance abuse treatment and sobriety since 2011."

The mother visited Pierce sporadically. She did not visit him or ask the department about him in the fifteen-month period from December of 2019 until February of 2021. At one point, the mother stated that she did not visit him because she "needed a little mental space and time."

The mother did seek mental health treatment in the months before trial, but did not provide the department with releases that would have permitted it to confirm her progress.

At the time of trial Pierce was six and one-half years old and had lived with the preadoptive parents and their three children for approximately five years. A play therapist reported that Pierce repeatedly stated that he was "so scared," that he was afraid to go up or down stairs, and that his imaginary play was violent. She diagnosed him with posttraumatic stress disorder (PTSD). The preadoptive parents reported flashbacks, nightmares, and fear of department social

5

workers.  According to a child trauma expert who conducted an in-person evaluation of Pierce over five sessions, he suffered from PTSD, was anxious and afraid, was hypervigilant, and had exaggerated emotional reactions.  The expert opined that it did not appear that Pierce was coached by the foster parents, particularly because the effects of child coaching generally do not last over multiple sessions.[4]  She stated that he used age-appropriate language to describe his fears and that his affect (disassociation, body rigidity, rapid breathing) could be attributed to PTSD.

The judge determined that the mother suffered from long-term mental health and substance use issues and posed a risk to Pierce's welfare.  She further found that Pierce had special mental health needs, that he required a high level of sensitivity, stability, and continuity, that the proposed adoptive parents were able to meet those needs, and that there was a strong bond between Pierce and the preadoptive parents. It is against this backdrop that we evaluate the mother's claims of error.

---

[4] Pierce reported abuse that the department was unable to substantiate.  He told the mental health professionals that his biological mother was not his mother, that his parents "stole" him, that his father was "bad," that he was "hit," and that his "pee pee" was hurt.  The mother and father claimed that these statements were coached.  The judge considered the reports not for their truth, but for the child's state of mind.

a.  Nexus.  The mother contends that there is no nexus between the mother's mental health issues, her drug use, and Pierce's welfare or her ability to care for him.  However, the record demonstrates that the mother has suffered from substance use disorder for a period of fifteen years, encompassing efforts at rehabilitation followed by relapse.[5]  While this pattern may be understandable, and all may hope that the mother will one day maintain her sobriety, the impact of such cyclical relapse on a child as fragile as Pierce is evident.  He was the second of three infants born substance exposed.  The mother took multiple unprescribed medications during the time she cared for him in 2019, and did not participate in substance abuse treatment for extended periods of time because she thought she did not need it.  In 2019 to 2020, while he was in the care of the preadoptive parents, she ceased all contact, recognizing that

---

[5] We agree with the mother's implicit argument that "evidence of alcohol or drug use is relevant to, but not dispositive of, 'a parent's willingness, competence, and availability to provide care.'"  Adoption of Luc, 484 Mass. 139, 147 (2020), quoting Care & Protection of Frank, 409 Mass. 492, 494 (1991).  "Treatment 'does not always work the first or even the second time, [and] relapse should not be cause for giving up on' an individual experiencing substance use disorder."  Adoption of Luc, supra, quoting Commonwealth v. Eldred, 480 Mass. 90, 99 (2018).  "Just as we should not criminalize addiction, . . . , parental rights should not be terminated only because the parent has a substance use disorder."  Id. at 147.  However, in this case, the mother was given multiple opportunities for treatment over a period of years, and at this juncture the best interests of the child is paramount.

she needed time and distance for her own recovery.  See generally Adoption of Yalena, 100 Mass. App. Ct. 542, 552-553 (2021).  The best interests of the child dictate that the needs of the child remain uppermost.  The judge's finding that the mother's ongoing substance abuse issues posed a risk to Pierce, a child particularly in need of stability and continuity, was not clearly erroneous.  See Adoption of Luc, 484 Mass. 139, 146-147 (2020).

b. Staleness.  The mother maintains that the evidence underlying the findings was stale to the extent that the judge relied on evidence before June of 2020, when she sought substance abuse treatment.  The judge was entitled to consider the mother's entire history.  "Prior history . . . has prognostic value."  Adoption of Luc, 484 Mass. at 145, quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989).  Moreover in the recent past she did not complete her residential treatment program and the judge found that she has been unable to maintain substance abuse treatment since 2011.

At trial in March of 2021, the mother testified that she had been in substance abuse and mental health treatment for approximately eight months; she testified that during that time, she had consistently provided clean drug tests.  The judge credited mother's testimony that she sought mental health treatment since July of 2020, but did not credit her other

8

statements because she did not provide releases to the department, which received only one toxicology screen, and did not meet with the department at any time since the case was opened to February 2021.  The judge was not required to credit the mother's self-report of sobriety in the face of her unwillingness to provide releases to the department that would have permitted it to validate her claims.  Credibility was for the judge, whose findings were not stale.

c.  Other factual findings.  The mother challenges several discrete factual findings.  For the sake of completeness, we address them below, but stress that even if all her evidentiary arguments were sustained, none of them (singly or in the aggregate) would alter our conclusion here.  The evidence was simply overwhelming that the mother's lengthy and troubled history of substance abuse rendered her unable to care for Pierce.

The mother claims that the finding that she had a history of domestic violence and engaged in an altercation in front of Pierce was clearly erroneous.  It is uncontroverted that the father obtained a restraining order against her; the allegations included a threat to "smash" the father's and the babysitter's faces.  She was arrested for violating the restraining order, resisting arrest, and disorderly conduct.  There was evidence that Pierce was inside the home when the confrontation on the

9

street occurred, but even if Pierce did not hear or see the confrontation, the fact of the confrontation remains, and was properly considered. See Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018) (domestic violence considered in assessment of parental fitness even if not witnessed by parties' children).

Similarly, the judge's finding that the mother had not provided stable housing was not in error. It is undisputed that at the time the mother had sole physical custody of Pierce, she did not have permanent housing but rather relied upon friends and family for short stays. She made no apparent effort to find permanent housing, and for large parts of this case was, in the judge's words, "whereabouts unknown." This is not a case where the department failed to assist a willing and engaged parent in locating housing. Rather, the mother failed to maintain contact with the department, avail herself of services, or secure enough of a foothold on her own health to provide a home (either with the maternal grandmother or elsewhere) in which to provide a stable environment to Pierce.[6] Cf. Adoption of Yalena, 100 Mass.

---

[6] The mother also claims that the judge should not have referred to the mother's "criminal history" because all cases were dismissed, that there was no evidence that Pierce was underweight due to her care, and that the judge's reference to a G. L. c. 119, § 51B, report that stated Pierce was not in school was irrelevant because he was not of school age. We need not reach these subsidiary arguments because none of them would impact our disposition of this appeal.

App. Ct. at 554 (parent's obligation to seek appropriate services).

2. Adoption plan. "In determining the best interests of the child, the judge must consider, among other things, 'the plan proposed by the department.' Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019), quoting G. L. c. 210, § 3 (c). . . . To determine the sufficiency of the plan, the judge may consider evidence and testimony 'regarding unfitness and the child's best interests, in addition to the written plan.' Adoption of Varik, supra. The judge's determination that a particular plan is in the child's best interests 'presents "a classic example of a discretionary decision" to which we accord substantial deference."'" Adoption of Xarissa, 99 Mass. App. Ct. 610, 619-620 (2021), quoting Adoption of Jacob, 99 Mass. App. Ct. 258, 272 (2021).

The father and the mother contend that placing the child with the preadoptive parents, who had hired a private investigator to film and follow them and department social workers, was at best insensitive and at worst, interfered with reunification and materially contributed to the mother's continued struggles with addiction, precipitating the finding of unfitness. The preadoptive parents did not act in conformity

11

with the department's regulations or expectations.[7]  However, the record evidence was that the preadoptive parents had provided a good home for Pierce, a child with a heightened need for security.  Moreover, the home was the only one the child had known for five of his six years.[8]  The department informed the foster parents that their conduct was not appropriate.  The foster parents signed an agreement promising to abide by the department's policies.  The child was placed with them again based on these assurances, and there is no indication that they violated the agreement.  The judge found that they acted out of concern for the child, who had cried when told he was going to visit his parents and refused to go.  The judge was permitted to find that the preadoptive parents had been overzealous in their efforts to protect him from perceived harm, but remained an appropriate adoptive family for the child.

We can well imagine that this placement, the adoptive parents' conduct, and the subsequent adoption, would be demoralizing to the parents.  In considering the appropriate

---

[7] For example, the preadoptive mother applied for a restraining order to prevent the department from reunifying Pierce with the parents in violation of 110 Code Mass. Regs. § 7.104(1)(h) (2009) (preadoptive parents must have ability "to accept and support the child's relationship with his/her parents, siblings and other family members and with the Department").

[8] The parents also claimed that the child was coached.  The judge credited the expert's opinion that the child was not coached. Questions of credibility are for the trial judge, and the finding was not clearly erroneous.

12

permanency plan here, however, the judge did as she was required to do, by focusing on the best interests of the child.  See Adoption of Bea, 97 Mass. App. Ct. 416, 426 (2020) ("'In considering what remedy, if any, is required to address . . . misconduct, our lodestar is, of course, the best interests of the child[].'  Adoption of Natasha, 53 Mass. App. Ct. 441, 450 [2001] [affirming termination of parental rights despite department's violation of its own regulations]").  The judge was faced with the choice of permitting a kinship adoption by a family that Pierce had known for almost all his life, or placement in the home of a stranger.  The judge did not abuse her discretion in deciding that the child, plagued by fears and anxiety, and in particular need of a calm and stable environment, should remain with the family he knew.

Decrees affirmed.

By the Court (Sullivan,
  Hand & Walsh, JJ.[9]),

*Joseph F. Stanton*

Clerk

Entered:  February 17, 2023.

---

[9] The panelists are listed in order of seniority.