# ADOPTION OF GEORGE & others.[1]

No. 88-P-772.

Middlesex. January 13, 1989. — May 8, 1989.

Present: ARMSTRONG, KASS, & WARNER, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Custody of minor. *Minor*, Custody. *Evidence*, Hearsay, Business record, Public documents, Communication with social worker, Communication between patient and psychotherapist, Privileged communication. *Privileged Communication*.

At the hearing on a petition by the Department of Social Services to dispense with the need for parental consent to the adoption of three minor children, the judge was warranted in finding, on clear and convincing evidence, that the children's mother was currently unfit to care and provide for each of the children and that adoption would be in the children's best interests. [268-269]

At the hearing on a petition by the Department of Social Services to dispense with the need for parental consent to the adoption of three minor children, the judge did not err in admitting in evidence various service plans and case reviews prepared by the department where, although certain of the documents in question were not prepared before the beginning of the proceedings and could not be received under the statutory business records exception to the hearsay rule, the documents were required to be kept under 110 Code Mass. Regs. §§ 501 (2), 5.02, 6.02-6.04, 6.09, and 6.12 (1987), and were admissible under the public documents or official records exception to the hearsay rule, authorizing admission of the record of a primary fact made by a public officer in the course of official duty and where, with regard to any expressions of opinion, evaluation, or judgment of the children or the parent found in the documents, such incompetent material was, in this case, without consequence. [269-275]

At the hearing on a petition by the Department of Social Services to dispense with the need for parental consent to the adoption of three minor children, the judge properly admitted testimony of one child's social worker about the mother's fitness, a psychiatric evaluation ordered by the Probate Court from its Family Service Clinic, and certain testimony of a witness

---

[1] Sidney and Thomas. The names, in accordance with our practice in cases involving the custody of minors, are fictitious.

alleged to be in violation of the patient-psychotherapist privilege which the mother sought to invoke on behalf of one of her children. [275]

PETITIONS filed in the Middlesex Division of the Probate and Family Court Department, two on May 23, 1985, and one on October 30, 1986.

The cases were consolidated and were heard by *Haskell C. Freedman*, J.

*Sharon Feigenbaum* for the mother.

*Countess C. Williams*, Assistant Attorney General, for Department of Social Services.

KASS, J. Within the 1,583 pages in the record (1,229 of testimony and 354 in the record appendix), there was tragically ample clear and convincing evidence to warrant the ultimate finding of the Probate Court judge that the mother was an unfit parent for George, Sidney, and Thomas. Having so found, the judge allowed the petition of the Department of Social Services under G. L. c. 210, § 3, that the mother's[2] consent to the adoption of those three of her children be dispensed with. See *Santosky* v. *Kramer*, 455 U.S. 745, 747-748 (1982); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 113-114 (1984); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 124-125 (1984). The mother has appealed.

We have the benefit of extensive findings of fact by the Probate Court judge, with references to supporting portions of the record. In far from inclusive summary, we set out those facts.

When she herself was twelve years old, the mother (whom we shall call Louise) had begun to behave in a self-destructive fashion. By the age of fifteen she left school. Soon thereafter, Louise ran away from home, lived on the streets and took to stealing cars. Eventually located by police, Louise was committed to McLean Hospital for psychiatric treatment. McLean,

[2] The biological mother and the biological father of George and Sidney contested the petitions to dispense with consent to the adoption of those children in the trial court. The mother also contested the petition as to Thomas. Only the mother has appealed from the decrees.

after some time, declared her too difficult to handle and asked her to leave. That was in December, 1975.

While sixteen, Louise became pregnant. She had just turned seventeen when Jill, who is not involved in this case, was born, alas, with multiple defects. Three months after Jill's birth, Louise took up with a man we shall call Phil. By him she gave birth to George in 1978 and Sidney in 1979. During this period Louise lived variously with Phil's family, her mother, and Phil's family again. Eventually she and Phil set up a household themselves. Phil regularly beat the children and Louise. Such was the level of violence, daily strife and conflict that the Department of Social Services (DSS) in 1979 took the children into care and protection and placed them in foster homes. A fourth child, Thomas, was born in 1984, father unknown. A fifth child, John, was born in 1985.

George, the second child, developed a volatile and violent character. Perhaps the most dramatic manifestation of his unlovely behavior patterns occurred of an afternoon when he pushed his little brother and a puppy out a third-story window. After shuttling back and forth between his mother's shifting homes (during the first four years of George's life, Louise moved at least nine times) and foster care placements, George was placed with a foster mother with whom he has lived since December, 1983. By reason of the application of intense and caring attention, the foster mother, with professional guidance, has enjoyed some success in modifying George's behavior.

Sidney, the third child, also was prone to physical and verbal violence. It amused him to torment younger children and to fantasize about harming his older brother and parents. His behavior so taxed the capacity of a foster home in which he had been placed in 1983, that he was removed to the New England Home for Little Wanderers. Louise proved unable to maintain visits with Sidney which had been provided for under a service plan promulgated by DSS. When she did turn up for visits, interaction with Sidney was unsatisfactory and, indeed, the child often lapsed into regressive behavior after visits with his mother. An experienced guardian ad litem for George and Sidney reported, "Sidney is the most frightening six year old

child I have ever met. He is a time bomb ticking away at the New England Home."

Thomas, the fourth child, was placed in the custody of DSS at age two months. DSS returned him to Louise shortly after the fifth child was born and when Thomas' age was one year and three months. Things did not go well. Thomas displayed signs of violence visited upon him. Among other things, Louise tried to force food into Thomas if he did not eat. She found it difficult to control her temper when dealing with the child and in one instance of impatience literally threw him into a play pen. Following a period of foster care and prior to his last removal from Louise's custody, Thomas regressed in speech and motor development. He lost weight. His development in his foster home placement has been normal, and Thomas regards his foster parents as his only parents.

1. *Sufficiency of the evidence of current unfitness.* As appears from the facts summarized, the judge made findings which added up to a twelve-year pattern of neglect, disorganization, and destructive handling by the mother of the three children with whom we are concerned. Unless clearly erroneous, the judge's findings stand. *Petition of Dept. of Social Servs. to Dispense with Consent to Adoption*, 397 Mass. 659, 671 (1986). *Adoption of Adam*, 23 Mass. App. Ct. 922, 924 (1986).

The mother protests that the evidence of her unfitness is stale and that her life has stabilized. She cares adequately for her eldest, Jill, and her youngest, John. To be sure, stale information cannot be the basis for a finding of current parental unfitness. *Petitions of Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 126. Prior history, however, has prognostic value. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. 180, 185 (1985). *Adoption of Diane*, 400 Mass. 196, 204 (1987). *Adoption of Abigail*, 23 Mass. App. Ct. 191, 196 (1986). Her history shows failures to follow through with therapy and other forms of assistance for her children and for herself. See *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. at 185. Louise consistently projects her inability to cope with her concededly difficult circumstances

on external forces: inadequate help from DSS, incapacity caused by a thyroid condition, short temper caused by birth control pills. Her plans for how she would deal with two hyperactive boys and their abused, neglected younger brother were unattached to any reality. The judge properly measured the acute needs of George, Sidney, and Thomas against Louise's limited capacity and heretofore chaotic life.

At the time of trial, Louise lived with her eldest and youngest. If she could care for them, she asks, how could she be an unfit parent? It may be answered in part that her ability to be a parent for Jill and John is a relative matter. The record is replete with evidence of neglect of them. The cases recognize that a parent may be fit to raise one child and not another. *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption*, 395 Mass. at 185 n.6. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 125. Much depends on the needs of the child. George and Sidney require intense and trained attention to a degree which could not be expected of Louise, who has two children at home, one of them very young. She lacks adult support; the father of the fifth child had moved out. Thomas falls apart when in his mother's custody. Given the needs of George, Sidney, and Thomas and the limited personal resources of Louise, it is apparent that the addition of George, Sidney, and Thomas to her responsibility is a recipe for disaster.

Louise also protests that DSS was insufficiently diligent to reunite the family and, indeed, plotted its separation. The record does not bear this out. DSS made repeated efforts to formulate supportive service plans. Louise was not able to cooperate. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 802 (1983); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987).

2. *Admissibility of case work documents.* Among forty-seven documents received in evidence, there were twelve service plans prepared by DSS, eleven case reviews by DSS, three foster care reviews by DSS, three adoption plans submitted to the Probate Court by DSS, and a miscellany of family assess-

ments, psychological evaluations, reports of court investigators, guardians ad litem, a home study, health clinic records, assessments and planning conference notes from the New England Home for Little Wanderers, a child abuse and neglect report, and letters from social workers. Six case reviews and two service plans were admitted without objection for the limited purpose of showing that a case review had occurred or that a service plan had been formulated. Thereafter, eleven service plans, three case reviews, three foster care reviews, and minutes of an assessment conference and five planning conferences at the New England Home for Little Wanderers were admitted in evidence without limitation over the objection of the biological parents.

The justification for admitting the documents objected to was that they fell within the statutory business records exception set forth in G. L. c. 233, § 78. There is no dispute that the various plans and case reviews were written in the regular course of business and that it was the regular course of business to make such memoranda. See G. L. c. 233, § 78; *Wingate* v. *Emery Freight Corp.*, 385 Mass. 402, 406-407, and Liacos, J., concurring, at 408-410 (1982); Liacos, Massachusetts Evidence 329 (5th ed. 1981). Indeed, the documents in question were required to be kept by governmental regulation, a subject to which we will return. There is some controversy whether the memoranda were written in good faith, but the trial judge found that they were. His finding on that score is the sort of preliminary determination of fact about the admissibility of evidence which an appellate court will regard as conclusive if there was evidence to support it. *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 672-673 (1980).

Certain of the documents attacked by the appellant were compiled after the petitions to dispense with consent to adoption had been filed on May 23, 1985. The business records exception requires that the document be created "before the beginning of the civil or criminal proceeding." G. L. c. 233, § 78, as appearing in St. 1954, c. 442, § 1. Objection on that ground was squarely raised in some instances, more obscurely in others. In overriding the objection on that score, the trial judge

expressed the view that "[T]he nature of this litigation is some-what of an exception to the ordinary business ruling . . . ." The particular subject of a cause, however, cannot undo an express limitation on the statutory exception contained in § 78.

As to the post-May 23, 1985, papers, the objection was indisputably sound. It was also sound as to the pre-May 23 documents, which were prepared in connection with care and protection proceedings under G. L. c. 119. Far more often than not, a petition to dispense with consent to adoption is preceded by an earlier care and protection process, during which the concerned agencies attempt to shore up the troubled family and reunify it. See G. L. c. 119, § 1; *Adoption of Emily*, 25 Mass. App. Ct. 579, 580-581 (1988). However much the agencies may labor toward the goal of holding the biological family together (see *Care & Protection of Three Minors*, 392 Mass. 704, 715-716 n.17 [1984]), the persons compiling documents in the case for DSS (or social agencies with which DSS arranges for services) must contemplate the possibility of later adoption related proceedings. The documents objected to, realistically seen, were not prepared before the beginning of the proceeding and could not be received under the statutory business records exception.

The Probate Court judge's intuition, however, was sound. That the contested documents were compiled after care and protection proceedings had begun did not stand in the way of receiving the service plans, case reviews, foster care reviews, etc., as records of a public agency. See *Commonwealth* v. *Slavski*, 245 Mass. 405, 417 (1923); *Lodge* v. *Congress Taxi Assn.*, 340 Mass. 570, 573 (1960); *Sawyer & Co.* v. *Southern Pac. Co.*, 354 Mass. 481, 483-484 (1968); *Julian* v. *Randazzo*, 380 Mass. 391, 393 (1980); *Rice* v. *James Hanrahan & Sons*, 20 Mass. App. Ct. 701, 705-706 (1985); Proposed Mass. R.Evid. 803(8);[3] Liacos, Massachusetts Evidence 340-342.

---

[3] The proposed rule would permit receipt in evidence of "[r]ecords, reports, . . . of public offices or agencies, setting forth . . . (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings and against the Commonwealth in criminal cases, factual findings resulting from an inves-

As developed in the cases, the public documents or official records hearsay exception authorizes admission of the record of a primary fact made by a public officer in the course of official duty.

The service plans, case reviews, and foster care reviews under challenge are required to be kept under 110 Code Mass. Regs. §§ 5.01(2), 5.02, 6.02-04, 6.09, and 6.12 (1987). Failure properly to document a case might be the basis for attacking a determination by DSS to dispense with consent to the adoption of a minor. It would be anomalous to require keeping of these records on the one hand while requiring that they be entirely ignored on the other when the case is under judicial review. The limitation on admission as public records of expressions of discretion, judgment, and opinion is not an absolute one. It is "a practical working rule" but "there may be exceptions." *Commonwealth* v. *Slavski*, 245 Mass. at 417. *Passanessi* v. *C. J. Maney Co.*, 340 Mass. 599, 603 (1960).

Recognition of the papers in question as documents required to be kept as official records does not, however, dispose of certain difficulties about how such documents may be used in the practical administration of a trial of a petition under G. L. c. 210, § 3. To the extent a service plan, for example, records the date of intake, the names of participating social workers and psychologists, identifies foster home placements, notes physical development of the child, states objectives of the service plan, and assigns tasks,[4] the document is useful to the trier of fact and, balanced against that utility, poses negligible danger of unfairness to the biological parent. As we have observed previously, the prior clinical history of parent and children assists in evaluating a child's or parent's current needs and capacities.

---

tigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." See, as to application of the analogous Federal rule, *Rice* v. *James Hanrahan & Sons*, 20 Mass. App. Ct. at 706 n.11.

[4] By way of example, tasks assigned in a service plan include: establish and maintain an apartment furnished to be safe for children; attend CORE meetings at school; obtain hearing aid for Jill; Louise to work with Dr. [psychiatrist] and Ms. [social workers] about supervision of children, safety issues, meals, bedtime routine, and discipline.

Many actors — social workers, teachers, foster parents, psychologists, psychiatrists, pediatricians, physicians, home visitors, education specialists, case managers, and supervisors — play roles in the handling of children at risk. Some will have gone to other work or other States by the time the case comes on for trial. When, as here, several children are involved, the cast of actors concentrating on a particular child is likely to vary. It would ill serve the interests of the parties or the court if each contributor to the case record were required to present testimony from her or his own mouth. To do so would not only be extremely time consuming but would be artificial. The professional with a heavy case load is unlikely to have accurate memory of the details of a particular case — routine at the time — except as recorded in case memoranda required by regulation. Practical administration of a trial may be weighed in deciding whether a document shall be received, for example, as a business record. *American Velodur Metal, Inc.* v. *Schinabeck*, 20 Mass. App. Ct. 460, 469 (1985). See, as to official statements, 5 Wigmore, Evidence § 1672 (Chadbourn rev. 1974); McCormick, Evidence 890 (3d ed. 1984).

What complicates the use of case files of the sort here in question is that they are laced with judgmental observations and opinion, e.g., "Louise would not acknowledge the difficulty of caring for two babies." "It would clearly be in Thomas's best interest to make a permanent adoptive placement for him with the [D's]. He has shown serious regression in the care of his mother who appears unable to commit herself to making changes in her care of him." "Mother has been insufficient in complying with the service plan." Expressions of policy, discretion, judgment, or evaluation are not generally admissible in evidence as official records. See *Middlesex Supply, Inc.* v. *Martin & Sons*, 354 Mass. 373, 374-375 (1968) (opinion as to cause of fire); *Julian* v. *Randazzo*, 380 Mass. 391, 393 (1980) (opinion as to whether use of firearm justified); *Wingate* v. *Emery Freight Corp.*, 385 Mass. at 409 (Liacos, J., concurring). *Rice* v. *Hanrahan & Sons*, 20 Mass. App. Ct. at 706 (expression of public policy as to hazardousness of an insulating material). As previously observed, the official documents ex-

ception has been applied to records of primary fact. "Primary fact" is not a self-defining phrase, but at least it connotes facts which can be recorded without recourse to discretion and judgment, e.g., the fire alarm sounded at 10:30 P.M.; it was raining lightly at the time of the accident; the child was placed with Mr. and Mrs. Doe for foster care on January 29, 1989.

Practical considerations, we think, favor the receipt in evidence of the documents here in question, with, however, screening out (so that the original records are not altered; the screening or editing could be done on photocopies) of expressions of opinion, evaluation, or judgment of the children or the resisting parent. Examination of the documents in issue does not suggest this would be an inordinately difficult task. Most of the content of the documents is doggedly routine.

Admission of official record documents with opinion, evaluation, and judgment material edited out is consistent with common law rules of evidence, which, with certain statutory exceptions,[5] are applicable to cases involving the separation of children from their parents. See *Custody of Two Minors*, 19 Mass. App. Ct. 552, 557 (1985). Nor are we dealing here with unrecorded information communicated to the trier of fact, as in *Duro* v. *Duro*, 392 Mass. 574, 580-581 (1984). As the documents were introduced through the persons who compiled them, those persons were, of course, subject to cross-examination. See *Gilmore* v. *Gilmore*, 369 Mass. 598, 604-605 (1976). To the extent that the source of information in a document of the sort here in question is available for cross-examination, more leeway may be afforded material that smacks of opinion, evaluation, or judgment.

It is a characteristic of elements of the service plans, case reviews, and assessments that they incorporate reported material supplied by other agency personnel, thus raising the problem of second level hearsay discussed in *Kelly* v. *O'Neil*, 1 Mass. App. Ct. 313, 316-317 (1973). Here, however, the sources of information were charged with reporting it as a

---

[5] See, e.g., G. L. c. 119, §§ 21 & 29. See also *Care and Protection of Benjamin*, 403 Mass. 24, 27 n.5 (1988); *Custody of Jennifer*, 25 Mass. App. Ct. 241, 245 n.4 (1988).

matter of duty and routine. The ultimate preparers of the written reports offered relied on material that was a part of the regular course of official record keeping. See *Wingate* v. *Emery Freight Corp.*, 385 Mass. at 406.

In this case, any incompetent material which drifted into the record was without consequence. Conclusions, judgments, and opinions in the documents were also the subject of testimony of witnesses. In his extensive findings the judge made primary reference to testimony, with occasional parallel citation to one of the challenged records. When the judge cited solely to a service plan or conference report, it was to establish its existence. There was no reversible error regarding the documents.[6]

3. *Other evidentiary matters.* There is an objection to the testimony of Sidney's social worker about the mother's fitness on the ground that she had not met the mother. The social worker could make inferences about parental competence by dealing with the child. That the mother had not been confronted was a proper subject for cross-examination and was brought out.

A psychiatric evaluation ordered by the Probate Court from its Family Service Clinic was properly admitted on the ground that the order had followed from the mother's motion to a different Probate Court judge for an evaluation of the mother and her children. If counsel for the mother desired to examine the psychiatrist who prepared the evaluation, she could have called him as a witness.

The mother's argument about violation of the patient-psychotherapist privilege is controlled by *Adoption of Diane*, 400 Mass. 196, 201-202 and n.4 (1987). The privilege is the patient's, here a child. The mother, whose interests, in the litigation setting, are in conflict with those of the child, may not invoke the privilege in the child's behalf.

*Decree affirmed.*

---

[6] It is possible that reports of the sort here in issue might contain material which is privileged under G. L. c. 112, § 135 (information from social workers), or G. L. c. 233, § 20B (information from psychotherapists). The point has not been raised in the instant case.