NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1274

ADOPTION OF MAB.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees issued by a Juvenile Court judge terminating their parental rights to their daughter, Mab.  We conclude that the judge properly found that the mother was indefinitely unfit in light of her mental health problems, her pattern of temporary improvement followed by decline, and her lack of affirmative progress.  We further conclude that the judge properly found that the father was indefinitely unfit as he required supports to parent successfully and abandoned the many supports provided to him by moving unannounced to New York.  As set forth below, the judge also properly based her conclusions on findings that the mother and the father both had difficulty parenting their older children.  Further concluding that the trial judge properly

---

[1] A pseudonym.

found that the Department of Children and Families (DCF) made reasonable efforts to reunite the child with the father, we affirm.[2]

1. Background. a. The mother's history. The mother has a long history of mental health problems and has reported diagnoses of anxiety, panic disorder, depression, attention deficit hyperactivity disorder (ADHD), and an unspecified learning disability. In April 2008, after the birth of her first child, the mother refused to attend therapy or a parenting program, and she was not prescribed any medication to treat her mental health. DCF assumed custody of the mother's first child, and the mother was never reunified with that child.

In March 2014, the mother applied for DCF services as she admitted that she struggled to take care of her second and third children.[3] Between 2014 and 2019, the mother failed to have those two children consistently attend daycare or school. In 2018, the mother admitted that her depression caused her to struggle to get up in the morning, preventing her from helping her two children attend daycare or school. There is no evidence that the mother was doing anything to address her mental health

_____

[2] The mother does not challenge the judge's finding that DCF made reasonable efforts to reunify the child with her.

[3] The mother's second child was born in July 2011, and her third child was born in September 2013.

2

at the time.  The mother had multiple angry outbursts against a social worker at the children's daycare and her mother (maternal grandmother), whom she was living with at the time.  The maternal grandmother's house was in a state of disarray with a cockroach infestation and piles of dirty clothes, garbage, and animal feces throughout the house.

In February 2019, DCF assumed custody of the mother's second and third children.[4]  Following removal, the mother engaged with an individual therapist but never signed a release for the DCF social worker to speak with the therapist.  In 2019, the mother completed a neuropsychological evaluation, an anger management class, and a parenting program.

b.  The father's history.  The father has an intellectual disability and cannot read or write.  In February 2013, DCF responded to a report of the father's and his then partner's disinterest in raising the younger of their two children.[5]  The father's apartment was filthy as the floor was barely visible under piles of food, trash, and clothing.  The apartment was in a drastically improved state when the DCF social worker returned

---

[4] The mother was never reunified with her second child.  She was briefly reunited with her third child between April 2021 and January 2022.

[5] At the time, the father and his then partner had two children, a daughter born in January 2012 and a second daughter born in February 2013.

3

two days later.  In July 2013, the father's younger child sustained second degree burns after the father attempted to give the child a bath in boiling water.  In July 2017, the father's apartment was again in a state of disarray with unclean surfaces and old food on the floor.  That same month, DCF removed both children, and the father's parental rights to the younger child were terminated.

c.  Removal of Mab.  The mother and the father met before July 2011, and the child was born in July 2020.  At first, the child lived with the mother and the mother's third child in a family shelter.  In December 2021, the mother, the third child, and Mab moved into the father's apartment.  The following month, the mother and the father had an argument which escalated to the mother's threatening the father with a knife, breaking the kitchen microwave, and dumping food from the refrigerator and cabinets onto the floor.  The mother was arrested, and DCF removed both children.  Mab was temporarily placed with her paternal aunt before being placed in foster care in February 2022.  In August 2023, she was placed in a preadoptive home and has remained with her preadoptive family since.

d.  The mother's involvement postremoval.  Following the removal of the child, the mother initially continued to live with the father before returning to live with the maternal

4

grandmother.  In February 2022, the month following the removal of the child, DCF referred the mother and the father to Communitas, a specialized parenting program for persons with cognitive disabilities.  After four or five months, the referral for the mother was closed as she missed appointments and failed to cooperate with the parenting aide.

Around the same time, the mother enrolled in an intimate partners violence (IPV) program.  In August 2022, while in a motor vehicle, the mother and the father engaged in a verbal fight, leading to the mother's exiting the vehicle when the father pulled into the breakdown lane.  After officers responded, the father was arrested for assault and battery on a police officer and resisting arrest.  The following month, the mother was arrested after she assaulted her sister when the sister made disparaging comments about her.  The mother recognized that her "mental health was everywhere" in that moment and she checked herself into the emergency room and a subsequent week-long mental health treatment program.  The mother was prescribed a mood stabilizer and attention deficit disorder medication.  Previously, the mother was prescribed medication for only her depression.

In August 2023, the mother completed the IPV program but did not take accountability for her past domestic violence.  The

5

following month, the mother was again referred to the parenting aide from Communitas but the mother again declined to engage with the service.

The mother attended nearly all her visits with the child and arrived on time for these visits. In May 2023, the mother's visits with the child were increased to supervised biweekly visits of three hours. The mother was appropriately engaged with the child during visits and responded to the child's needs, including ending visits early if the child was tired. During two separate visits in 2023, the mother demonstrated appropriate emotional regulation as she did not become flustered by circumstances outside of her control. The judge found that the mother formed a positive emotional bond with the child.

In April 2023, the DCF social worker referred the mother to a shelter after she expressed interest in moving out of the maternal grandmother's house given its uncleanliness. The mother had experienced housing instability since her first involvement with DCF in 2008 and experienced homelessness during the trial. In January 2024, the mother asked for and received a third referral for a parenting aide through Communitas. The mother met with the aide weekly and was receptive to the parenting aide's advice.

e. _The father's involvement postremoval._ Following the removal of the child, the father accepted and completed the referral to Communitas. Around the same time, the father enrolled in and later completed an IPV program. Following completion of the IPV program, the father enrolled in a nurturing father's program. In May 2022, the father requested and received a second referral to another parenting aide but struggled with absorbing the provided information and missed appointments.

Throughout his time in Massachusetts, the father engaged with the Department of Developmental Services (DDS). The father's DDS provider assisted the father with shopping and paying rent. Given the father's inability to read or write, the DCF social worker read aloud the action plan during home visits and provided copies of the plan to both the father's DDS provider and his attorney. In May 2022, the father and his attorney met with the DCF's social worker and DCF's Americans with Disability Act (ADA) team. From October 2022 through December 2023, the father attended weekly visits with a therapist. This therapist worked with the father to improve his reading and writing.

Beginning in December 2022, the father married and began visiting New York weekly, where his wife and his wife's two

children resided. In August or September 2023, the father moved his belongings to New York without notifying DCF. The father's move violated the father's criminal probation conditions. The father gave contradictory testimony about the move. He testified on October 5, 2023, that he was living in New York, but then testified on October 12 that he had moved back to Massachusetts and expected his wife to move there as well. The judge found that the latter testimony was false. As late as March 2024, the DCF social worker had no confirmation of where the father lived.

Prior to the move, the father had regularly attended his biweekly visits with the child. After October 2023, the father failed to attend any in-person visits with the child. In September 2023, the father was referred to the same parenting aide he had previously worked with from Communitas but the father failed to meet with the aide as he lived in New York. The same month, the father was removed from the nurturing father's program. When the father visited Massachusetts in December 2023, he did not visit with the child despite visiting with one of his other children. Since moving to New York, the father has not engaged in any services and has made no attempt to engage with services. Between October 2023 and March 2024, the DCF social worker was unable to contact the father.

In February 2023, the father completed a parenting capacity evaluation with Dr. Nicole Brisson.  She determined that the father had "very strong conative abilities," meaning the ability "to learn the parenting skills . . . and the motivation to continue to improve his parenting and learn ongoing."  She opined that he required supports to parent, such as a DDS provider or a therapist.  At trial, Dr. Brisson acknowledged that it would be problematic if the father did not have supports beyond his new wife.

2.  Standard of review.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  "Because termination of a parent's rights is an 'extreme step,' . . . a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'"  Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992).  "In making this determination, a judge must consider 'a

9

parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Adoption of Mary, 414 Mass. 705, 711 (1993). General Laws c. 210, § 3 (c), provides a nonexhaustive list of factors to be weighed in determining the fitness of a parent.

Where there is clear and convincing evidence that the parent is unfit and likely to remain so, we give substantial deference to the trial judge's decision regarding the child's best interests and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). An abuse of discretion exists where the decision "amounts to a 'clear error of judgment' that falls 'outside the range of reasonable alternatives.'" Adoption of Talik, 92 Mass. App. Ct. 367, 375

(2017), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

3. Parental unfitness. a. The mother's unfitness. "Mental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility." Adoption of Luc, 484 Mass. 139, 146 (2020), quoting Adoption of Frederick, 405 Mass. 1, 9 (1989). Here, the mother argues that the trial judge failed to consider her improved mental health, particularly after she was prescribed a mood stabilizer in September 2022. We disagree. In her decision, the trial judge specifically cited two 2024 visits where the mother exhibited emotional control in difficult situations and noted the mother's request for and work with a parenting aide in January 2024. Accordingly, the judge recognized the mother's improved mental health since September 2022 but permissibly considered this recent improvement within the broader context of her overall history. See Adoption of Jacques, 82 Mass. App. Ct. at 608 ("judge was entitled to consider the evidence of her recent improvements within the context of her earlier and continuing deficits"). When considered in this context, the mother's recent improvement fits within an established pattern of temporary improvement followed by reversion. See id. at 607, quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989)

11

("Although 'stale information cannot be the basis for a finding of current parental unfitness . . . [p]rior history . . . has prognostic value'").

This pattern began in 2008 when the mother refused to address her mental health, leading to the removal of her first child. Between 2014 and 2018, the mother admitted to DCF that she was overwhelmed by her parenting responsibilities, particularly in ensuring her children attend daycare and school. The mother subsequently admitted that her unaddressed depression contributed to her being unable to help her children get to daycare and school in the morning.

Upon removal of her second and third children in 2019, the mother showed signs of improvement, enrolling in individual therapy and completing a neuropsychological evaluation, an anger management class, and a parenting program. These improvements proved temporary, however, as the mother was again overwhelmed by her parental responsibilities following the birth of Mab in 2020 and the return of her third child in 2021. Although the mother continued to attend individual therapy, she declined to sign a release of her therapist's notes to the DCF social worker. After the child was removed in January 2022, the mother refused to cooperate with her parenting aide, ending the service after just four or five months. When referred back to the aide

12

in September 2023, the mother again refused the service, insisting that she had "passed" her last session.  Moreover, the mother demonstrated no accountability for her past domestic violence upon completing the IPV program.

Even after the mother was prescribed a mood stabilizer in September 2022, the mother failed to show any positive signs of progress (as opposed to the mere absence of problems) until she requested a parenting aide referral in January 2024.  Accordingly, in light of the limited affirmative evidence of the mother's progress, it was reasonable for the judge to rely on the mother's history of a lack of cooperation with DCF services and general lack of accountability in determining that the mother remained indefinitely unfit.  Adoption of Luc, 484 Mass. at 145 ("a judge may rely upon a parent's past conduct with regard to older children to support a finding of current unfitness as to a different child, so long as that evidence is not the sole basis for the judge's unfitness determination").[6]

---

[6] The mother's argument that the judge placed "undue emphasis" on the mother's housing instability is unavailing. The trial judge noted that the mother experienced housing instability throughout her history with DCF and that the mother was homeless during the later trial dates.  See Adoption of Knox, 102 Mass. App. Ct. 84, 93 (2023) (judge may consider "demonstrated inability to provide [the child] a safe and stable home").  As noted by the trial judge, the mother's housing instability was "not determinative," but was relevant because it exemplified the effects of the mother's mental health problems.

b. <u>The father's unfitness</u>. The father argues that "the judge diminished Father's positive parenting traits and chose to focus on his shortcomings due to his mental incapacity." We disagree. The evidence at trial, particularly the testimony of Dr. Brisson, established that the father needed a support system given his cognitive disability. Prior to his engagement in services, the father demonstrated significant parental shortcomings, as exemplified by his failure to understand the risks of his bathing his second child in boiled water. Moreover, even when engaged in services, the father plainly needed help as shown by his inability to remember Mab's clothing sizes, or the grade or school of his oldest child. Moreover, the father was unable to identify the oldest child's specific learning disability and the services she received and was further unable to contact Mab's pediatrician even after being told how to do so. Accordingly, it was reasonable for the trial judge to conclude that the "Father's mental deficiencies necessitate a strong support system for him to adequately care for [the child]."

Consistent with the evidence at trial and Dr. Brisson's opinion, the judge noted that, "[w]ith the proper supports, Father has an equitable opportunity to parent his children." The judge properly credited the father for engaging "in

14

individual therapy . . . , DDS services, an IPV program, a parenting class, and with numerous parent aides." This positive engagement, however, was completely undone by the father's unannounced and unacknowledged move to New York. By not providing DCF or DDS notice of his move, the father effectively abandoned the services he required and had come to rely on to parent successfully. Moreover, the move was compounded by the father's failure to seek New York-based services. The evidence at trial, corroborated by Dr. Brisson, established that the father could not rely on only his new wife for support.

Finally, the father's abandonment of his needed services must be considered in light of his effective abandonment of the child. After October 2023, the father maintained only virtual visits with the child and failed to visit the child when he returned to Massachusetts to visit his oldest child. Given the father's near complete disengagement with DCF and the child since October 2023, it was reasonable for the trial judge to conclude that the father was indefinitely unfit.

4. <u>Reasonable efforts</u>. "The department is 'required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties.'" <u>Adoption of West</u>, 97 Mass. App. Ct. 238, 241 (2020), quoting <u>Adoption of Lenore</u>, 55 Mass.

App. Ct. 275, 278 (2002). "A judge's determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, supra at 242.

Here, the record at trial supported the judge's finding that DCF made reasonable efforts to reunite the father and the child. Indeed, the evidence showed that, from the outset, DCF appropriately tailored its services to the father's cognitive disability. Within a month of the child's removal, DCF referred the father to a parenting aide who specialized in working with those with cognitive disabilities. After this service concluded and the father met with DCF's ADA team in May 2022, DCF immediately referred the father to a second parenting aide who had previously worked with those with cognitive disabilities. In September 2023, DCF referred the father to the Communitas parenting aide he had first worked with, but the father did not meet with the aide as he was then living in New York. Moreover, given the father's inability to read or write, the DCF social worker read aloud the action plan tasks and "would try to use language that was easy to understand" during home visits and provided copies of the plan to both the father and his attorney. Finally, between October 2022 and December 2023, the father attended weekly visits with a therapist who worked with the father to improve his reading and writing.

16

The father's argument that DCF did not make reasonable efforts to reunite him with the child because it failed to offer him services while he was in New York is unpersuasive. The evidence at trial shows that the father never definitively told his social worker that he had moved to New York and indeed falsely testified that he had moved back to Massachusetts. Given the fact that the father initially was only visiting New York weekly and that the father testified to such in August 2023, it was not immediately apparent that the father had in fact permanently moved to New York as of the fall of 2023. Although the father testified in October 2023 that he lived in New York, his social worker was unable to contact him between October 2023 and March 2024 to confirm that the father had in fact permanently moved to New York. If the father had been forthcoming about his move in the fall of 2023, DCF would have had a fair opportunity to engage its counterpart in New York in providing services.[7] Accordingly, the trial judge reasonably

---

[7] For the same reason, the father's claim that DCF failed to initiate an Interstate Compact on the Placement of Children (ICPC) request is unpersuasive. Moreover, there is nothing in the ICPC statute, St. 1963, c. 452, § 1, that requires DCF to make an ICPC request when a parent moves out of state. Instead, "ICPC applies when an agency seeks to transfer a child out of State 'for placement in foster care or as a preliminary to a possible adoption.'" Adoption of Zaden, 104 Mass. App. Ct. 523, 526 (2024), quoting St. 1963, c. 452, § 1.

17

concluded that DCF made reasonable efforts.  Adoption of Yalena, 100 Mass. App. Ct. 542, 554 (2021) ("The department's obligation to make reasonable efforts to reunify the child with the mother is contingent upon her obligation to substantially fulfill her parental responsibilities [including seeking and using appropriate services]").

Decrees affirmed.

By the Court (Ditkoff, Hand &
  Grant, JJ.[8]),

*Paul Little*

Clerk

Entered:  August 12, 2025.

---

[8] The panelists are listed in order of seniority.