NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1353

ADOPTION OF RASHAAD (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from decrees of the Juvenile Court finding her unfit to parent her two children, terminating her parental rights, and committing the children to the custody of the Department of Children and Families (department).[2]  The mother argues that the judge abused his discretion in concluding that her unfitness would continue undiminished into the future, that the judge abused his discretion in denying her motions in limine to exclude various records offered by the department, and that her trial counsel was ineffective for failing to identify which statements in the records were inadmissible.  We affirm.

---

[1] Adoption of Julian.  The children's names are pseudonyms.

[2] The judge also found the father unfit and terminated his parental rights.  The father did not appeal.

Background.  The mother and the father met in 2016 while both were receiving inpatient treatment at a mental health facility.  In October 2017 their first child, Rashaad, was born.  Approximately two months later, the department received two reports under G. L. c. 119, § 51A (51A report), alleging neglect of Rashaad by both parents; the reports raised concerns about the parents' mental health.  After an investigation under G. L. c. 119, § 51B, the department deemed the allegations to be unsupported but opened a clinical case for further assessment.

In February 2019 police responded to the parents' apartment after a neighbor reported hearing the mother screaming and crying.  The father tried to assault the officers and was arrested.  After a 51A report was filed, department social workers spoke to the mother, who denied that any altercation had occurred or that she had screamed for help.  The mother appeared not to understand why the workers were there and, when asked about her mental health, became upset and defensive.  The mother stated that she had bipolar disorder, that she stopped taking her medications because she was pregnant, and that she did not need therapy.  The mother refused to discuss her previous hospitalizations and stated she was not interested in pursuing a restraining order against the father or in implementing a safety plan with the department. Based on the mother's statements and the father's arrest, the department assumed emergency custody of

2

Rashaad and placed him in a foster home.  In March 2019 the department moved Rashaad to the home of the paternal grandparents, where he remained through trial.

In April 2019 Julian was born.  The same day, the department received a 51A report alleging neglect of Julian by the mother.  The reporter alleged that the mother did not receive prenatal care until her third trimester and was behaving erratically, prompting the delivering physician to call for an urgent psychiatric consult.  Hospital staff reported to the responding department workers that the mother had refused to allow Julian to receive a Hepatitis B vaccine or undergo glucose testing.  The workers then spoke to the paternal grandfather, who reported that the mother had made various concerning statements, including that she believed that the department kidnapped children to sell their organs and that she would kill herself if Julian were removed from her custody.  When questioned by the workers, the mother stated that she was diagnosed with "bipolar depression" in 2016 but denied that she was previously hospitalized for her mental health issues or that the delivering physician had requested a psychiatric consult. The department assumed emergency custody of Julian and placed him in the paternal grandparents' home, where he remained through trial.

Soon after Rashaad was removed from the mother's custody, the department provided the mother with an action plan to assist her toward reunification.  The action plan was amended several times, but the core tasks remained consistent.  These included working cooperatively with the department, completing medication and parenting psychological evaluations, engaging in therapy, attending all scheduled supervised visits, and avoiding verbal and physical altercations.

While the action plans were in place from March 2019 to September 2024, the mother failed to make progress on the majority of her tasks.  She did not participate in a medication evaluation or provide the results from any psychological or parenting psychological evaluations, despite reporting that she completed them.  Although the mother engaged in individual therapy, she changed providers frequently and did not establish a consistent clinical relationship with any of them.  After terminating services with one provider, the mother sent an e-mail message to her ongoing social worker accusing the provider of being a "German spy."  The social worker then spoke with the provider, who reported that the mother appeared to be having delusions and was "decompensating."  The mother consistently maintained that she did not have any unaddressed mental health needs and did not need to participate in services.

4

In addition, throughout the pendency of the case, the mother was unable to control her outbursts and displayed open hostility and aggression toward department staff and the paternal grandparents. The mother sent numerous text and e-mail messages to department workers that contained racial slurs, derogatory names, threats, and profanity. In these messages the mother referred to the department as a criminal organization, accused the department of "kidnapping" the children, and referred to department workers as "child abusers." The mother also sent numerous messages to the paternal grandmother calling her derogatory names; in one text message, the mother accused the paternal grandparents of "creating the [corona]virus and working with bats." The mother also threatened the paternal grandparents repeatedly, saying she "knew where to find" them and they would be "dead" if anything happened to the children. In February 2020 the paternal grandmother obtained a restraining order against the mother, but the mother violated the order a few months later when she went to the parental grandparents' home, banged on the door, and demanded to be let in.

The mother's volatile and aggressive behavior at times necessitated termination of foster care review meetings and supervised visits with the children. The mother also missed numerous visits and, for several months in 2021, refused to attend because of a personal conflict she had with a department

5

staff member.  When she did attend visits, the mother was often more than fifteen minutes late, acted inappropriately in front of the children, and was unable to manage both children at once. During one visit in June 2019, the mother became verbally aggressive with a department staff member and "cornered" her. During another visit in January 2024, the mother became angry and aggressive when a social worker used a hand motion to redirect one of the children.  The mother barricaded herself and the children in the visiting room, causing the children to become upset and cry; berated the department staff, using homophobic and racial slurs and making derogatory remarks about their appearances; and screamed that the department was harassing her.  The department called for police assistance and contacted the paternal grandfather to help deescalate the mother and retrieve the children.  When the paternal grandfather arrived, the mother yelled, "Grandpa is old and is going to die," upsetting the children even further.

At the time of trial, the mother was not engaged in individual therapy or psychiatric services and was not taking medications.  She testified that she ended therapy because she no longer felt it was helpful.  When asked whether she understood how her mental health issues affected her children, the mother refused to answer, causing the judge to draw a negative inference.  The mother also refused to say when she

6

stopped taking her medications.  When asked about her 2016 inpatient treatment, the mother testified that the police took her to the hospital because she had a rodent infestation in her apartment.  The judge observed that the mother consistently struggled to regulate her emotions throughout her testimony.

Discussion.  1.  Termination.  In determining whether to terminate parental rights, a judge must first find by clear and convincing evidence that the parent is unfit.  See Adoption of Nancy, 443 Mass. 512, 515 (2005).  The judge must then determine "whether the parent's unfitness is such that it would be in the child's best interests to end all legal relations between parent and child."  Id.  "The 'best interests of the child' standard requires . . . trial judge[s] to make a discretionary decision based on [their] experience and judgment, and will not be overturned unless it amounts to an abuse of discretion or a clear error of law."  Adoption of Garret, 92 Mass. App. Ct. 664, 675 (2018).

For the first time at oral argument, the mother claimed that the judge erred in finding her unfit.  Because the mother failed to raise that claim in her brief, it is waived.  See Santos v. U.S. Bank Nat'l Ass'n, 89 Mass. App. Ct. 687, 700 n.14 (2016).  In any event, even were we to put aside the waiver, we would conclude that the record supports the judge's ultimate finding of unfitness.  The judge's subsidiary findings, none of

which the mother challenges as clearly erroneous in her brief, establish that the mother has longstanding, serious mental health issues, which remained unaddressed at the time of trial. The mother denied having any mental health needs, did not engage in or meaningfully benefit from services, and, as the judge found, "prioritized her anger at the [d]epartment over the safety and well-being of the . . . children and her opportunity to spend time with them." The judge further found that the mother had ongoing contact with the father, despite his history of violent behavior, which had at times necessitated police intervention. The totality of this evidence clearly and convincingly supports the judge's finding of unfitness.

Next, the judge was within his discretion to conclude that it would be in the children's best interests to terminate the mother's parental rights. The judge found that the mother's unfitness will continue undiminished into the future in light of her "lack of progress over the past five years" in treating her mental health issues and her continued denial that she needs treatment. Although the mother argues that the judge overlooked her efforts at engaging in therapy, the judge expressly considered that evidence but found that the mother changed providers frequently, "preventing her from establishing a consistent clinical relationship," and "consistently maintained that she did not have any unaddressed mental health needs and

8

did not need to participate in" therapy or psychiatric services. The judge properly concluded that the mother's participation in some therapy did not "ameliorate her parental shortcomings." See Adoption of Ilona, 459 Mass. 53, 59-60 (2011) ("Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary").

The judge was also within his discretion to conclude that the department's plan for the children to be adopted by the paternal grandparents was in the children's best interests. Both children were placed in the paternal grandparents' home in 2019 and remained there through trial. It is uncontested that the paternal grandparents have provided the children with a safe and stable home environment and that the children have a strong bond with them. This evidence further supports the judge's determination that the children's best interests would be served by terminating the mother's parental rights. See Adoption of Breck, 105 Mass. App. Ct. 652, 661 (2025).

2. Motions in limine. The mother filed several motions in limine to exclude records offered by the department. Citing Adoption of George, 27 Mass. App. Ct. 265 (1989), the judge denied three of the motions -- which sought to exclude foster

care review reports, family action plans, and family assessments -- on the ground that "counsel has failed to identify requested redactions." This was not an abuse of discretion. The pretrial conference order stated that "[m]otions in limine shall include a specific description of the content which the moving party seeks to have stricken" and that "[a] copy of the proposed exhibit, with the targeted content highlighted, shall be attached to the motion." The order warns that "otherwise, the Court will be unable to rule on the motions." As the mother's motions did not comply with these requirements, the judge permissibly denied them. See Adoption of Hugo, 428 Mass. 219, 232 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999) (judge's evidentiary rulings reviewed only for abuse of discretion).

We are unpersuaded by the mother's contention that the judge abused his discretion by relying on Adoption of George, which, the mother says, was abrogated by Adoption of Luc, 484 Mass. 139 (2020). In Adoption of George, 27 Mass. App. Ct. at 272-274, we held that service plans, case reviews, and foster care reviews created by the department are admissible under the official records exception to the hearsay rule. Adoption of Luc did not disturb that part of our decision. See Adoption of Luc, supra at 151; Mass. G. Evid. § 1115(b)(2) (2025). Rather, Adoption of Luc clarified that, while official department

10

records are generally admissible, hearsay statements within the records are only admissible if "the hearsay source is specifically identified in the document and is available for cross-examination, should the party challenging the evidence request to do so." Adoption of Luc, supra at 153. Here, because the mother did not identify any particular hearsay statements, the judge did not run afoul of Adoption of Luc by admitting the records. To the extent the mother argues that the foster care review reports were inadmissible in their entirety because the author of the reports are not identified, that argument is both waived for failure to raise it to the judge and belied by the record.[3]

3. Ineffective assistance of counsel. Relatedly, the mother argues that her trial counsel was ineffective for failing to identify the inadmissible portions of the department records. "Absent exceptional circumstances, we do not review claims of ineffective assistance of counsel for the first time on appeal." Care & Protection of Stephen, 401 Mass. 144, 149-150 (1987). Here, the mother did not "move to stay the appeal in order to

---

[3] Each of the foster care review reports begins by naming the "Case Reviewer." In her motion in limine, the mother did not argue that the "Case Reviewers" were not the authors of the reports. Rather, she argued that the reports "fail[] to identify if the . . . 'creators' were merely a social worker[,] case worker[,] a licensed appropriate medical provider, or an attorney."

11

allow prosecution of a motion for new trial in the trial court," which is "the preferred approach" for raising claims of ineffective assistance. Adoption of Ulrich, 94 Mass. App. Ct. 668, 673 (2019).

The mother argues, however, that her claim can be resolved on direct appeal because its factual basis appears indisputably on the trial record. Even assuming that to be true, and further assuming that counsel's performance was deficient, we conclude that the mother has failed to demonstrate prejudice given the "overwhelming proof" of her unfitness. Care & Protection of Georgette, 439 Mass. 28, 34 (2003). The key factual findings underlying the judge's decision to terminate the mother's parental rights -- which relate to the mother's serious mental health issues, her failure to meaningfully engage in or benefit from treatment, and her continued denial that she has any mental health needs -- were supported by the trial testimony of multiple witnesses, including that of the mother herself. The judge would have been within his discretion to reach the same decision based on the testimony alone. Furthermore, the judge was entitled to rely on the department records to establish primary facts. See Adoption of Luc, 484 Mass. at 153. Although the mother claimed at oral argument that six of the judge's findings rely on inadmissible statements of opinion, we have reviewed those findings and conclude they are almost entirely

12

limited to primary facts.  And to the extent the findings cite statements that verge on opinion, those statements were cumulative of the testimony at trial.  The mother has thus failed to demonstrate that she was prejudiced by any deficient performance of her trial counsel.

<u>Decrees affirmed</u>.

By the Court (Rubin, Shin & Singh, JJ.[4]),

*Paul Little*

Clerk

Entered: November 21, 2025.

---

[4] The panelists are listed in order of seniority.